## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.B.-B., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Case No. 20-cv-846 (RJL) |
| | ) |
| MARK A. MORGAN, Acting | ) |
| Commissioner, U.S. Customs and Border | ) |
| Protection, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

August 27, 2020 [Dkt. #12]

Plaintiffs are four mothers and their seven children from Honduras, Ecuador, and Mexico who seek asylum in the United States based on fears of kidnapping, rape, torture, and murder by individuals connected to politicians or drug cartels in their home countries. With their lives potentially on the line, they challenge a January 30, 2020 Memorandum of Agreement delegating authority from U.S. Citizenship and Immigration Services ("CIS") to allow agents from U.S. Customs and Border Protection ("CBP") to conduct "credible fear" interviews for asylum seekers. Plaintiffs contend that the Memorandum of Agreement (1) was issued in violation of the Federal Vacancies Reform Act, (2) violates the Homeland Security Act's delegation of asylum authority to CIS, (3) violates the Immigration and Nationality Act's requirements for the asylum process, (4) is arbitrary and capricious in violation of the Administrative Procedure Act, (5) violates the Due Process

Clause of the Fifth Amendment to the U.S. Constitution, and (6) violates the U.N. Convention Against Torture's protection against *refoulement*.

Plaintiffs faced imminent removal from the United States after their negative "credible fear" determinations by CBP agents were upheld by immigration judges. As such, they sought a temporary restraining order preventing their removal and, as relevant here, preliminary injunctive relief barring CBP agents from conducting further credible fear interviews pursuant to the January 30, 2020 Memorandum of Agreement. While plaintiffs raise many important claims, I need address only one of them here because plaintiffs have shown a likelihood of success on the merits of their claim that the use of CBP agents who receive substantially less training than CIS asylum officers to conduct asylum interviews violates the Immigration and Nationality Act. Weighing the preliminary injunction factors, I find that plaintiffs are entitled to preliminary injunctive relief. Accordingly, the Court hereby GRANTS plaintiffs' motion for a preliminary injunction [Dkt. #12].

## BACKGROUND

### I.     The Expedited Removal System

Prior to 1996, noncitizens who entered the United States without valid authorization generally received a full hearing in immigration court before they could be removed. In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), amending the Immigration and Nationality Act ("INA") to establish an "expedited removal" process through which certain noncitizens seeking admission to the United States could be removed "without further hearing or review," 8 U.S.C.

§ 1225(b)(1)(A)(i).  *See* Pub. L. No. 104-208, 110 Stat. 3009–546 (1996) (codified as amended in scattered sections of 8 U.S.C.).  Under the expedited removal framework, an alien "who is arriving in the United States" or "certain other aliens" shall be ordered "removed from the United States without further hearing or review."  8 U.S.C. § 1225(b)(1)(A).  However, the IIRIRA created an exception for individuals who indicate "an intention to apply for asylum" or "a fear of persecution" upon returning to their home countries.  *Id.*  Under this exception, an immigration officer "shall refer the alien for an interview by an asylum officer," *id.* § 1225(b)(1)(A)(ii), to determine whether the alien "has a credible fear of persecution," *id.* § 1225(b)(1)(B)(ii).  A "credible fear of persecution" is "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."  *Id.* § 1225(b)(1)(B)(v).  To establish eligibility for asylum, an applicant must show that there is at least a 10% chance that he or she will be persecuted based on one of the five protected grounds: race, religion, nationality, membership in a particular social group, or political opinion.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439–40 (1987).

In the INA, Congress requires that asylum officers conducting these interviews must have "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators" of asylum applications.  8 U.S.C. § 1225(b)(1)(E).  They must also be "supervised by an officer" who has the requisite training and "has had substantial experience adjudicating asylum applications."  *Id.*  The asylum interview is designed to "elicit all relevant and useful information bearing on

whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d). The asylum officer must therefore "conduct the interview in a nonadversarial manner" and provide an interpreter if the asylum officer "is unable to proceed competently in [the] language" of the interviewee. *Id.*

After the interview, if the asylum officer determines that the alien has a credible fear of persecution, the alien shall be detained pending further consideration of his or her asylum application. 8 U.S.C. § 1225(b)(1)(B)(ii). If not, the alien shall be ordered "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(B)(iii). However, any determination that an alien does not have a credible fear of persecution shall receive "prompt review by an immigration judge" at the alien's request. *Id.* § 1225(b)(1)(B)(iii)(III).

## II.     U.S. Department of Homeland Security

This expedited removal process falls within the jurisdiction of the U.S. Department of Homeland Security and its constituent agencies. The Department of Homeland Security ("DHS") is a cabinet-level department of the federal government with responsibility for domestic security, including issues of terrorism, border security, immigration, cybersecurity, and disaster prevention and management. *See Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 845 (D.C. Cir. 2006). Congress created DHS in the Homeland Security Act ("HSA") of 2002, after the terrorist attacks of September 11, 2001 raised "concerns regarding a federal system that diffused the responsibility for domestic security among numerous separate and independent agencies." *Nat'l Treasury Emps. Union v. Chertoff*, 385 F. Supp. 2d 1, 5–6 (D.D.C. 2005); *see* Pub. L. No. 107-296, 116 Stat. 2135

(2002) (codified as amended in scattered sections of 6 U.S.C.). In the resulting agency reorganization, Congress eliminated the Immigration and Naturalization Service ("INS") and replaced it with three sub-agencies that report to DHS: the Bureau of Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement. *See Kaur v. Chertoff*, 489 F. Supp. 2d 52, 55 n.5 (D.D.C. 2007). Other sub-agencies within DHS include the Transportation Security Administration, the Federal Emergency Management Agency, the U.S. Coast Guard, and the U.S. Secret Service, among others.

As relevant here, the Bureau of Citizenship and Immigration Services ("CIS") succeeded the INS in administering the United States' immigration and naturalization adjudication system. *See* 6 U.S.C. § 271. In the HSA, Congress gave the Director of CIS authority over adjudications of immigrant visa petitions, naturalization petitions, asylum and refugee applications, and any other issues previously adjudicated by the INS. *Id.* § 271(b). By regulation, the Refugee, Asylum, and International Operations ("RAIO") Directorate within CIS has jurisdiction over asylum applications and credible fear determinations. 8 C.F.R. § 208.2(a).

U.S. Customs and Border Protection ("CBP"), on the other hand, is a law enforcement agency that manages border control, including enforcing U.S. immigration and customs regulations, interdicting persons or goods illegally entering or exiting, collecting import duties, and regulating international trade. *See* 6 U.S.C. § 211. CBP agents are "highly trained law enforcement personnel" who conduct screenings at the border for illegal immigration, narcotics smuggling, and illegal importation, and apprehend

individuals for suspected violations of U.S. law.  *See* Border Security, U.S. Customs & Border Prot., https://www.cbp.gov/border-security (last visited Aug. 29, 2020).

### III.     January 2020 Memorandum of Agreement

Since 2002, trained asylum officers from CIS's RAIO Directorate have conducted all asylum interviews and made all credible fear determinations.[1]  However, on June 25, 2019, Acting CIS Director Ken Cuccinelli issued DHS delegation 2019-001, which delegated authority to CBP agents to conduct credible fear interviews.  *See* Defs.' Opp'n, Ex. 4, Decl. of Stephen Dove, Ex. 1, Dep't of Homeland Sec., Delegation to the Commissioner of U.S. Customs and Border Protection Regarding Credible Fear Determinations ("June CIS Delegation") (June 25, 2019) [Dkt. #17-4].  The June CIS Delegation states that it is "[s]ubject to the terms of a separate Memorandum of Agreement" between Acting CIS Director Cuccinelli and the highest ranking official at CBP.  *Id.* ¶ II.

On July 10, 2019, Acting CIS Director Cuccinelli and Acting CBP Commissioner Mark Morgan entered into such a Memorandum of Agreement implementing the June 25, 2019 delegation.  *See* Pls.' Mot. for Prelim. Inj. ("Pls.' PI Mot."), Ex. 1, Memorandum of Agreement ("July MOA") ¶ 2 (July 10, 2019) [Dkt. #12-3].  The purpose was to "set forth terms under which USCIS and CBP can foster collaboration through a Task Force (TF) assignment for the purposes of training and hearing credible fear (CF) claims and making

---

[1] *See* Refugee, Asylum and International Operations Directorate, U.S. Citizenship & Immigration Servs. (Mar. 10, 2020), https://www.uscis.gov/about-us/directorates-and-program-offices/refugee-asylum-and-international-operations-directorate; U.S. Citizenship & Immigration Servs., Asylum Division, Affirmative Asylum Procedures Manual (May 2016), https://www.uscis.gov/sites/default/files/document/guides/AAPM-2016.pdf.

determinations through the interview process." *Id.* ¶ 3.  Under the agreement, CBP could assign U.S. Border Patrol agents to conduct credible fear interviews.  *Id.* ¶ 4.B.  By its terms, the July MOA would expire unless extended after 180 days.  *Id.* ¶ 8.

After the July MOA expired on January 6, 2020, CIS Deputy Director Mark Koumans and Acting CBP Commissioner Morgan entered into a new Memorandum of Agreement on January 30, 2020.  *See* Compl., Ex. A, Memorandum of Agreement ("January MOA") (Jan. 30, 2020) [Dkt. #3-1].  The January MOA assigns CBP law enforcement officers to replace CIS asylum officers in conducting asylum interviews and making credible fear determinations.  *See id.* ¶ 3.  Under the January MOA, no CBP agent assigned to conduct asylum interviews shall do so for longer than 180 days.  *See id.* ¶ 4.B.vii.  The January MOA is to remain in effect for 180 days unless terminated by the parties, and it can be renewed up to 180 days by a signed extension.  *Id.* ¶ 8.

### IV.    Plaintiffs' Challenge

Plaintiffs are mothers and their children from Honduras, Ecuador, and Mexico who seek asylum in the United States.  They are currently detained at the South Texas Family Residential Center in Dilley, Texas.  Compl. ¶¶ 5, 13–17.  Each plaintiff's asylum interview was conducted by a CBP agent pursuant to the January 30, 2020 Memorandum of Agreement, and each plaintiff received a negative credible fear determination.  *Id.* ¶¶ 14–17.  In each case, the plaintiff's negative determination was affirmed by an immigration judge.  *Id.* ¶ 13.

Plaintiff A.B.-B. is a Honduran woman who seeks asylum for herself and her 8-year-old son, plaintiff S.B.-B.  *Id.* ¶ 14.  She fled Honduras because she had been beaten,

raped, and threatened with death by two former romantic partners.  Pls.' Emergency Mot. for TRO & Related Administrative Stay ("Pls.' TRO Mot."), Ex. A, Decl. of A.B.-B. ¶ 3 [Dkt. #8-1].   One former romantic partner "is associated with powerful politicians in Honduras" and has "threatened to kill [her]" and "already attempted to kidnap [her] son." *Id.*  The other former romantic partner, her son's father, "used to be an assassin" and has threatened to kill her.  *Id.*   According to plaintiff A.B.-B., she reported her son's father's abuse to the police once, but after the police detained him for 24 hours, "he bribed the police to let him go." *Id.* ¶¶ 5–6.  Plaintiff A.B.-B. sought asylum in the United States and had her credible fear interview with a CBP agent on February 4, 2020; the agent issued a negative credible fear determination on February 7, 2020, and this determination was affirmed by an immigration judge on February 12, 2020.  Compl. ¶ 14.

Plaintiff M.A.G.-M. is an Ecuadorian woman who seeks asylum for herself and her 1-year-old son, plaintiff D.G.M.-G.  *Id.* ¶ 15.  She fled Ecuador because a man with powerful connections to the government and police in Ecuador abducted, beat, and raped her once and attempted to do so again.  Pls.' TRO Mot., Ex. D, Decl. of M.A.G.-M. ¶¶ 3– 5 [Dkt. #8-4].  She had previously reported this man to the police for stabbing her father; he has since threatened to stab her like he did to her father and has threatened to kill her son.  *Id.* ¶¶ 3, 5.  She explained that the man told her if she moved elsewhere in Ecuador, he would find her with the help of his friends in government.  *Id.* ¶ 6.  Plaintiff M.A.G.-M. sought asylum in the United States and had her credible fear interview on January 30, 2020; the agent issued a negative credible fear determination on January 31, 2020, and the determination was affirmed by an immigration judge on February 7, 2020.  Compl. ¶ 15.

Plaintiff L.E.-L. is a Mexican woman who seeks asylum for herself and her 2-year-old daughter, plaintiff I.I.E.-L. *Id.* ¶ 16. She fled Mexico with her daughter because she had been threatened and beaten by men from a specific cartel based on her sexual preference for women. Pls.' TRO Mot., Ex. C, Decl. of L.E.-L. ¶ 3 [Dkt. #8-3]. Plaintiff L.E.-L. stated that her ex-partner—her daughter's father—raped her and forced her to stay with him because she could not be "out" as lesbian in her religious and anti-gay community. *Id.* ¶ 4. She also stated that men wearing official police or military uniforms would come to her house and ask for money, force her and her daughter to take off their clothes, and beat them. *Id.* ¶ 5. On one occasion, when she had no money to give these men, they beat her and threatened to kill her and her daughter if they did not leave town. *Id.* ¶ 6. She was afraid to report any of these acts to the police because her female partner had previously reported abuse to the police and then had been abducted and murdered. *Id.* ¶ 7. Plaintiff L.E.-L. had her credible fear interview on February 20, 2020, which resulted in a negative credible fear determination on March 2, 2020; this determination was affirmed by an immigration judge on March 10, 2020. Compl. ¶ 16.

Plaintiff A.P.-S. is a Mexican woman who seeks asylum for herself and her four minor children, plaintiffs E.L.R.-S., A.A.R.-S., B.J.R.-S., and W.G.L.-S. *Id.* ¶ 17. Her family owns a successful ranch in Mexico that has apparently earned them significant financial wealth and public prominence, as well as the fury of a specific cartel. Pls.' TRO Mot., Ex. B, Decl. of A.P.-S. ¶¶ 3–4 [Dkt. #8-2]. She seeks asylum in the United States because she fears that this specific drug cartel will murder her and her children, as it has targeted her family. *Id.* ¶ 3. This cartel has kidnapped, tortured, and killed her family

members, including her husband, uncles, and others, and has threatened to kill her. *Id.* The police have been of little help to her family, as they have not investigated the death of her husband or the threats to her own life. *Id.* ¶ 5. Plaintiff A.P.-S. had a credible fear interview with a CBP agent on February 24, 2020, and received a negative credible fear determination on February 27, 2020, which was affirmed by an immigration judge on March 3, 2020. Compl. ¶ 17.

## V.   Procedural History

On March 27, 2020, plaintiffs filed a complaint against defendants Mark A. Morgan, Acting Commissioner of U.S. Customs and Border Protection; Chad F. Wolf, Acting Secretary of Homeland Security; Kenneth T. Cuccinelli, Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services; Andrew J. Davidson, Acting Chief of the Asylum Division of U.S. Citizenship and Immigration Services; and William P. Barr, Attorney General (collectively, "defendants"). The complaint raises six claims: *First*, that CBP's entry into the January MOA is invalid because Mark Morgan's appointment to serve as Acting CBP Commissioner violates the Federal Vacancies Reform Act and the Appointments Clause of the U.S. Constitution. *Second*, that the January MOA violates the Homeland Security Act, which gives authority over adjudicating asylum claims to CIS rather than CBP. *Third*, that use of CBP agents to conduct asylum interviews violates the Immigration and Nationality Act and the Refugee Act, which require asylum officers to receive certain levels of training and conduct interviews in a nonadversarial manner. *Fourth*, that the January MOA is arbitrary and capricious because it inhibits legitimate applications for asylum without a reasonable justification. *Fifth*, that use of CBP

agents and failure to apply the requisite procedural protections violates the Fifth Amendment's Due Process Clause. And *sixth*, that use of CBP agents to conduct asylum interviews has the goal or practical result of violating the protection against *refoulement* codified in the Immigration and Nationality Act and the U.N. Convention Against Torture.

After receiving notice that some plaintiffs were "in imminent danger of being removed from the country within the next 24 hours," plaintiffs moved for a temporary restraining order and administrative stay on April 1, 2020. Pls.' TRO Mot. at 1 [Dkt. #8]; *see also id.*, Ex. E, Decl. of Allison E. Herre at ¶¶ 1, 3 [Dkt. #8-5]. That evening, I temporarily enjoined defendants from removing plaintiffs from the United States pending a telephonic hearing set for April 2, 2020 at 3:00 PM. 4/1/2020 Order. After that hearing, I granted an administrative stay to preserve the status quo pending my ruling on plaintiffs' forthcoming motion for a preliminary injunction. *See* Order [Dkt. #11]. The parties finished briefing the motion for a preliminary injunction on April 27, 2020, and I held a telephonic hearing on May 12, 2020. Because the issues were particularly complicated and new issues were raised at the hearing, I allowed the parties to offer supplemental briefing, which they submitted on June 1, 2020.

## JURISDICTION

The Court must first assess whether it has jurisdiction to review plaintiffs' challenges to the January 2020 Memorandum of Agreement. Federal district courts have general subject-matter jurisdiction over "all civil actions arising under the Constitution, law, or treaties of the United States." 28 U.S.C. § 1331. However, Congress may limit this general grant of jurisdiction "by establishing an alternative statutory scheme for

administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019). In the IIRIRA, Congress stripped jurisdiction from the federal courts to review four specific types of claims related to expedited removal: "individual determination[s]" related to removal, decisions by the Attorney General to invoke expedited removal, application of expedited removal to individual aliens, and, unless otherwise provided, "procedures and policies adopted by the Attorney General." 8 U.S.C. § 1252(a)(2)(A). However, Congress preserved judicial review in this court of claims that "a regulation, or *a written policy directive, written policy guideline, or written procedure* issued . . . to implement" the expedited removal system is "in violation of law." *Id.* § 1252(e)(3)(A)(ii) (emphasis added). The parties do not dispute that the January MOA is a written policy guideline or procedure issued to implement the expedited removal system. *See* Pls.' PI Mot. at 44; Defs.' Opp'n at 13–17.

Nevertheless, the Government contends that plaintiffs' challenge to this policy is untimely because plaintiffs filed their suit more than 60 days after CIS's original June 25, 2019 delegation of authority to CBP to conduct asylum interviews. Under the IIRIRA, any suit challenging a written policy guideline or procedure related to expedited removal as unlawful must be filed "no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first *implemented*." 8 U.S.C. § 1252(e)(3)(B) (emphasis added). Plaintiffs filed their suit on March 27, 2020, within 60 days of the January 30, 2020 Memorandum of Agreement but more than 60 days from both the June 25, 2019 CIS delegation of authority and the July 10, 2019 Memorandum of Agreement. The question, then, is which policy or procedure is the operative one that

plaintiffs challenge.  Because I conclude that plaintiffs' challenge is to the January MOA, the Court has jurisdiction to review plaintiffs' challenge.  How so?

Under DHS policy, the January MOA is the operative written policy guideline or procedure that implements CIS's delegation to CBP.  Per the DHS Secretary's original delegation of authority to CIS in June 2003, the re-delegation of asylum-related authority from CIS to CBP, to the extent it is not contrary to a statute such as the Homeland Security Act, must occur with the CBP Commissioner's consent.  *See* Defs.' Opp'n, Ex. A, Decl. of Juliana Blackwell, Ex. 1, Dep't of Homeland Sec., Delegation to the Bureau of Citizenship and Immigration Services ("2003 DHS Delegation") ¶ IV (June 5, 2003) [Dkt. #17-1] ("The Director or the highest ranking official also may re-delegate the authority contained in this delegation to the Commissioner of CBP or to Assistant Secretary for ICE, with their consent.").  The June 25, 2019 delegation from Acting CIS Director Cuccinelli to CBP was issued *only* by CIS and contains no indication of consent from the CBP Commissioner.  *See* June CIS Delegation at 2.  Acting CBP Commissioner Morgan first consented to the delegation in the July 10, 2019 Memorandum of Agreement, *see* July MOA at 5, which was initially the operative written policy guideline or procedure implementing CIS's delegation.

Moreover, the June 25, 2019 delegation states that it is "[s]ubject to the terms of a separate Memorandum of Agreement," June CIS Delegation ¶ II, which had not yet been issued.  Without the substantial details laid out in the Memorandum of Agreement, CBP agents could not have "implemented" the delegation and been able to conduct credible fear interviews.  Indeed, in a similar case before one of my colleagues concerning the July

MOA, the Government took the position that the delegation was first implemented either when the July MOA became effective or when a CBP agent first conducted a credible fear interview under the July MOA. *See M.M.V. v. Barr*, Case No. 19-cv-2773, Defs.' Suppl. Mem. in Opp'n to Pls.' Mot. for TRO at 17–18 (D.D.C. Dec. 27, 2019) [Dkt. #59].  In its own pleadings and argument before this Court, the Government repeatedly refers to the Memoranda of Agreement as "implementing" the delegation. *See, e.g.*, Defs.' Notice of Ratification & Suppl. Authority at 2 [Dkt. #22]; 5/12/2020 Hr'g Tr. 21:12–14 [Dkt. #26] ("[T]he January MOA provides the operational implementation of this delegation that first occurred back in June 2019 for CBP.").  As such, I conclude that the June CIS Delegation was not operative by itself and required a Memorandum of Agreement between CIS and CBP to implement it.

Finally, plaintiffs correctly note that the January MOA is a separate policy guideline or procedure from the July MOA, not merely an extension of it.  Tr. 15:13–16:20.  By its own terms, the July MOA could be in effect for only 180 days and, having not been renewed, expired on January 6, 2020. *See* July MOA ¶ 8.  CIS and CBP did not renew the July MOA and instead issued a new, substantively different Memorandum of Agreement on January 30, 2020. *Compare* July MOA ¶ 4.B. (authorizing U.S. Border Patrol agents to conduct asylum interviews), *with* January MOA ¶ 4.B. (authorizing U.S. Customs and Border Protection agents to conduct asylum interviews).  Therefore, the "written policy guideline or procedure" "implement[ing]" the delegation that plaintiffs challenge here— the procedure by which plaintiffs were interviewed by CBP agents rather than CIS asylum officers—is the January MOA adopted on January 30, 2020. *See* 8 U.S.C. § 1252(e)(3).

Plaintiffs filed their challenge within 60 days of that policy, and this Court therefore has jurisdiction under 8 U.S.C. § 1252.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain preliminary injunctive relief, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The last two factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Of course, the movant carries the burden of persuasion. *See Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

Although our Circuit Court has taken no position on the "sliding scale approach" after *Winter*, *see, e.g.*, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018), "the movant must, at a minimum, 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 334–35 (D.D.C. 2009) (quoting *Winter*, 555 U.S. at 22). The Supreme Court has established that the first two factors—likelihood of success on the merits and irreparable harm—"are the most critical." *Nken*, 556 U.S. at 434. Plaintiffs need only establish a likelihood of success on the merits of one claim to obtain the injunctive relief that they seek. *See D.C. v. U.S. Dep't of Agriculture*, 444 F. Supp. 3d 1, 21 (D.D.C. 2020).

## ANALYSIS

### I.    Likelihood of Success on Merits

Plaintiffs have shown a likelihood of success on the merits of their claim that using CBP agents to conduct asylum interviews violates the Immigration and Nationality Act, which requires asylum officers to receive certain levels of training and conduct interviews in a non-adversarial manner. *See* Pls.' PI Mot. at 22–32.  In the INA, Congress required that asylum interviews be conducted by an asylum officer who has had "professional training in country conditions, asylum law, and interview techniques *comparable to that provided to full-time adjudicators*" of asylum applications.  8 U.S.C. § 1225(b)(1)(E)(i) (emphasis added).  DHS regulations also require that asylum officers receive special training on "international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles."  8 C.F.R. § 208.1(b).  Each asylum officer conducting an interview must be "supervised by an officer" who has the requisite training and "has had substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E)(ii).  The asylum officer must also "conduct the interview in a nonadversarial manner."  8 C.F.R. § 208.30(d).

Plaintiffs contend that CBP agents assigned to replace trained CIS asylum officers under the January MOA "receive less training than real asylum officers and have received insufficient training to qualify to serve as asylum officers per the statutory requirements." Compl. ¶ 58; *see also* Pls.' PI Mot. at 23–25.  I agree.  As of February 2020, training for CIS asylum officers consisted of at least 9 weeks of formal training and 3 to 4 weeks of additional credible fear training for asylum officers in offices with heavy credible fear

caseloads, such as Houston and Arlington.[2]  *See also* Defs.' Opp'n, Ex. 6, Decl. of Ashley

B. Caudill-Mirillo ¶ 10 [Dkt. #17-6] ("USCIS asylum officers generally receive training

over a 9 week period that is comprised of 110 hours of distance learning and 208 hours of

residential training.").  CIS asylum officers also must receive 4 hours per week of ongoing

training.  *See id.*  Additionally, they receive specialized training on certain topics such as

working with survivors of torture, intercultural communication, interviewing children, and

interviewing applicants who have experienced trauma.  *See* Pls.' PI Mot., Ex. 22, Ashley

Caudill-Mirillo, *Laws of Hospitality: Asylum and Refugee Law Panel*, Cooper Union/Villa

Gillet at 3, 4, 7 [Dkt. #12-24].

The Government contends that CBP agents who conduct asylum interviews receive

"trainings consistent with [CIS's] prior training history and experience" and therefore meet

the statutory criteria. Defs.' Opp'n at 20.  Poppycock!  The training requirements cited in

the Government's declaration do not come close to being "comparable" to the training

requirements of full asylum officers.  Under the January MOA, CBP agents receive

"approximately 80 hours of distance training and up to 120 hours of face-to-face training."

Caudill-Mirillo Decl. ¶ 11.  If "comparable" means "similar or equivalent," then 2 to 5

weeks of distance and in-person training for CBP agents is in no way "comparable" to at

least 9 weeks of formal training for CIS asylum officers.  *See* Am. Heritage Dictionary 180

---

[2] *See* U.S. Gov't Accountability Office, Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings at 27 (Feb. 2020), https://www.gao.gov/assets/710/ 704732.pdf ("Asylum Division officials said the 9 combined weeks of distance and residential basic training constitute the minimum amount of formal training required for asylum officers to effectively screen credible and reasonable fear cases.").

(4th ed. 2001).[3]  Indeed, the Government admits that it decided that "[t]he full scope of training required for USCIS asylum officers is not necessary for [CBP agents] assigned to the limited role of conducting credible fear interviews."  Caudill-Mirillo Decl. ¶ 11; *see also* Tr. 23:18–24:13 (arguing "the full scope of training" is "not required" because of the "other duties" that CIS asylum officers perform that CBP agents do not).  However, regardless of the reasoning for DHS's decision, Congress disagreed.  To make matters worse, the January MOA precludes any individual CBP agent from conducting credible fear interviews for longer than 180 days, *see* January MOA ¶ 4.B.vii., meaning that CBP agents cannot gain the experience necessary to appropriately apply the complex asylum laws and regulations.  These procedures plainly violate Congress's requirements.

DHS regulations and CIS guidelines also require that asylum interviews be nonadversarial proceedings with a neutral decision-maker.  8 C.F.R. § 208.30(d).[4]  While it is not necessary at this stage of the proceedings for the Court to decide whether CBP agents could ever lawfully be given authority to conduct asylum interviews and adjudicate asylum claims, *see* Compl. ¶¶ 108–09, it would certainly seem unlikely under these circumstances.  After all, law enforcement officers typically "function as adversaries" whose role is "to investigate criminal activity, to locate and arrest those who violate our laws, and to facilitate the charging and bringing of such persons to trial."  *New Jersey v.*

---

[3] *See also Comparable*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/comparable ("capable of or suitable for comparison; similar, like") (last visited Aug. 29, 2020); *Comparable*, *MacMillan Dictionary*, https://www.macmillandictionary.com/us/dictionary/american/comparable ("fairly similar to another thing, so that it is reasonable to compare them") (last visited Aug. 29, 2020).

[4] *See also* U.S. Citizenship & Immigration Servs., RAIO Directorate – Officer Training, Interviewing – Introduction to the Non-Adversarial Interview (Dec. 20, 2019), https://www.uscis.gov/sites/default/ files/document/foia/Interviewing_-_Intro_to_the_NonAdversarial_Interview_LP_RAIO.pdf.

*T.L.O.*, 469 U.S. 325, 349 (1985) (Powell, J., concurring).  Not surprisingly, CBP itself characterizes its agents as "highly trained law enforcement personnel" who conduct screenings at the border for illegal immigration, narcotics smuggling, and illegal importation, and apprehend individuals for suspected violations of U.S. law.  *See* Border Security, U.S. Customs & Border Prot., https://www.cbp.gov/border-security (last visited Aug. 29, 2020).

The Government's response that it has "taken steps to eliminate or at least minimize the possibility for such interviews to become adversarial," Defs.' Opp'n at 21, hardly seems sufficient.  Indeed, its primary example of these so-called "steps" is simply ceasing an interview if an agent discovers he or she was involved in apprehending the asylum seeker being interviewed. *Id.* at 22.  While eliminating such obvious conflicts of interests is surely necessary, it provides little comfort that CBP agent interviews will be nonadversarial.  For that matter, neither does the Government's assurance that it has mandated that CBP agents "[c]onduct non-adversarial [credible fear] interviews," January MOA ¶ 4.C.iv.  In the final analysis, CBP agents need to receive, at a minimum, the same amount of training that CIS asylum officers receive if they are going to overcome their adversarial instincts and act as neutral decision-makers.  Because they clearly have not received such training, the Court need not address at this stage what else may be required, or whether CBP agents could ever serve as asylum officers, a job traditionally performed by CIS officers.

This statutory violation cannot be subject to the Government's proposed harmless error–type analysis. *See* Defs.' Opp'n at 40–41.  These training requirements are essential for a functioning asylum process, which is why Congress required them.  The legal

framework surrounding the U.S. immigration, asylum, refugee, and non-*refoulement* adjudication process is complex, to say the least. After all, an asylum officer who is *not* adequately trained in the applicable legal requirements is less likely to ask the right questions of an asylum seeker, or for that matter, to gather the facts necessary to make an accurate determination of whether an asylum seeker has a credible fear of persecution. Indeed, the record here contains several examples of the effects of inadequate training: one CBP agent failed to follow up with questions about an asylum-seeking plaintiff's sexual abuse, and another failed to inquire into another asylum-seeking plaintiff's husband's murder investigation. *See* A.B.-B. Decl. ¶ 13; A.P.-S. Decl. ¶¶ 5–6, 8. Though an immigration judge conducts a *de novo* review of a negative credible fear determination, *de novo* review of the written record means little where the record is incomplete or inaccurate due to the interviewer's inadequate training. For these reasons, plaintiffs have shown a likelihood of success on the merits of their claim that allowing CBP agents to conduct asylum interviews under the January MOA violates the Immigration and Nationality Act. The first factor therefore weighs in favor of preliminary injunctive relief.

## II.    Irreparable Harm

Next the Court must weigh whether plaintiffs have established that they would face an irreparable harm absent preliminary injunctive relief. Plaintiffs allege two types of harm: deprivations of physical liberty from continued detention and risk of physical harm upon return to their home countries. Pls.' PI Mot. at 38–41. The risk of physical harm is surely well established enough here. Plaintiffs' declarations explain that they each fled their home countries due to threats of abuse, torture, sexual assault, kidnapping, and even

death, to themselves and to their children. *See* A.B.-B. Decl. ¶¶ 3–7; M.A.G.-M. Decl. ¶¶ 3–8; L.E.-L. Decl. ¶¶ 3–8; A.P.-S. Decl. ¶¶ 3–6. While the Court takes no position on whether plaintiffs are ultimately entitled to asylum, the Court must assume plaintiffs' likelihood of success on the merits when assessing whether irreparable harm exists. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).

In the absence of preliminary injunctive relief, plaintiffs would be subject to immediate removal from the United States to countries where they face significant risk of physical harm. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018), *aff'd in part and rev'd in part sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020). To say the least, this harm could not be remedied after the court has an opportunity to rule on the merits of plaintiffs' complaint. *See Sean B. v. McAleenan*, 412 F. Supp. 3d 472, 488 (D.N.J. 2019) (finding it "quite likely" that a person in a foreign country "in hiding, and under a threat of death" "could not effectively litigate an immigration appeal" and that, if death threats were carried out, the review process would be moot). As previously discussed, plaintiffs' claims of irreparable harm are not diminished by an immigration judge's review if the record that the immigration judge reviews is potentially inaccurate or incomplete as a result of inadequately trained asylum officers. For these reasons, I find that plaintiffs have sufficiently established irreparable harm, weighing in favor of preliminary injunctive relief.

### III.   Balance of Equities / Public Interest

The balancing of the equities and the public interest, which merge when the Government is the defendant, *Nken*, 556 U.S. at 435, also weigh in favor of plaintiffs. As

previously discussed, proceeding to the merits of this litigation without preliminary injunctive relief risks plaintiffs being returned to home countries where they face significant risk of physical harm.  These life-or-death consequences weigh heavily in favor of preliminary injunctive relief.  *See Grace*, 344 F. Supp. 3d at 146; *see also Bridges v. Wixon*, 326 U.S. 135, 164 (1945) (Murphy, J., concurring).

Of course, the Government has a strong interest in the "prompt execution of removal orders."  *Nken*, 556 U.S. at 436.  However, the Government and public can have little interest in executing removal orders that are based on statutory violations, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."), especially where those statutory violations may compromise the accuracy of such removal orders.  *R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015); *Grace*, 344 F. Supp. 3d at 141–44. Indeed, the public has an interest "in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Nken*, 556 U.S. at 436.  As such, the balance of interests here weighs in favor of preliminary injunctive relief.

## CONCLUSION

Thus, for all of the foregoing reasons, plaintiffs' Motion for a Preliminary Injunction [Dkt. #12] is GRANTED.  A separate Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge